UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| SHANE DOUGLAS BELL, | 4:21-CV-04134-LLP |
| Plaintiff, | |
| vs. | ORDER GRANTING PLAINTIFF'S |
| | MOTION FOR LEAVE TO AMEND |
| DARIN YOUNG, in his individual capacity; | COMPLAINT, GRANTING IN PART AND |
| TROY PONTO, in his individual and official | DENYING IN PART DEFENDANTS' |
| capacity; JENNIFER DREISKE, in her | MOTION FOR SUMMARY JUDGMENT, |
| individual capacity; STEVEN SWYGERT, in | AND RULING ON MISCELLANEOUS |
| his individual and official capacity; HAYLEY | MOTIONS |
| BUOL, in her individual and official capacity; | |
| JORDAN MOOS, in his individual and official | |
| capacity; DAREK EKEREN, in his individual | |
| and official capacity; JAYMIE ZOSS, in her | |
| individual and official capacity; LINDA | |
| MILLER-HUNHOFF, in her individual and | |
| official capacity; JULIE DENNING, in her | |
| individual and official capacity; TAMMY | |
| MERTENS-JONES, in her individual and | |
| official capacity; ALEXANDRIA ALSDORF, in | |
| her individual and official capacity; JESSICA | |
| COOK, in her individual and official capacity; | |
| JOSHUA WESTERKIRCHER, in his individual | |
| and official capacity; DAN SULLIVAN, in his | |
| official capacity, KELLIE WASKO, in her | |
| official capacity. | |
| Defendants. | |

Plaintiff, Shane Douglas Bell, an inmate at the South Dakota State Penitentiary

("SDSP"), filed a pro se lawsuit under 42 U.S.C. § 1983. Doc. 1. This Court screened Bell's

complaint, dismissing it in part and directing service upon defendants in part. Doc. 8.

Specifically, Bell's First Amendment retaliation claim against defendants Darin Young,[1] Troy

---

[1] Bell brings claims against Darin Young, the former SDSP Warden, in his individual and
official capacity. Under Federal Rule of Civil Procedure 25(d), "[a]n action does not abate when
a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold

1

Ponto, Jennifer Dreiske,[2] Steven Swygert, Hayley Buol, Jordan Moos, Darek Ekeren, Jaymie

Zoss, Julie Denning, Alexandria Alsdorf, Joshua Westerkircher, and Jessica Cook, his First

Amendment free exercise and Religious Land Use and Institutionalized Persons Act

("RLUIPA") claims against defendants Young, Ponto, Dreiske, Linda Miller-Hunhoff, and

Tammy Mertens-Jones, and his First Amendment denial of access to literature claims and

Fourteenth Amendment equal protection claim against defendants Young and Miller-Hunhoff

survived screening. *Id.* at 19.[3] Bell's remaining claims, including claims against all defendants in

their official capacities for money damages, were dismissed. *Id.* at 19-20. Bell moves for leave to

amend his complaint, which defendants oppose. Docs. 54, 56. Defendants now move for

summary judgment, which Bell opposes. Docs. 35, 63. For the following reasons, Bell's motion

for leave to amend complaint is granted, and defendants' motion for summary judgment is

granted in part and denied in part.

## I. Factual Background

---

office while the action is pending. The officer's successor is automatically substituted as a party."
The current SDSP Warden is Dan Sullivan, who is automatically substituted for Young on the
official capacity claims.

[2] Bell brings claims against Jennifer Dreiske, a former deputy warden at SDSP, in her individual
and official capacity. Under Rule 25(d), Dreiske's successor is automatically substituted as a
party for Bell's official capacity claims. But Bell does not identify Dreiske's successor, and his
official capacity claims against other defendants remain to provide injunctive relief. Thus, Bell's
claims against Dreiske in her official capacity are dismissed.

[3] Bell's surviving claims also named Correctional Officer Neilson, Brandon Balsavage, Destiny
Maranowski, Correctional Officer Loneman, Mike Leidholt, and Terri, Summit Manager, as
defendants. *See* Doc. 8 at 19. Summons for these defendants were returned unexecuted. Doc. 17
at 2, 5, 8, 11, 20; Doc. 24 at 1. Bell has not served these defendants, and they are not listed in the
caption of Bell's most recent filing. *See* Doc. 67 at 1. Thus, Correctional Officer Neilson,
Brandon Balsavage, Destiny Maranowski, Correctional Officer Loneman, Mike Leidholt, and
Terri, Summit Manager, are dismissed from this case.

The Court recites the relevant facts in the light most favorable to Bell because the defendants move for summary judgment. Where facts relevant to the remaining claims are disputed, both parties' averments are included.

Bell filed a previous civil rights lawsuit against several SDSP officials, including some of the same defendants named in this suit, on April 5, 2016. *See Bell v. Young*, 4:16-CV-04046, Doc. 1. In his previous lawsuit, Bell alleged that a prison mail policy preventing prisoners from receiving donated books violated his First Amendment rights. *Id.* at 6. That lawsuit was dismissed on February 5, 2019, after the parties reached a settlement revising the donated books policy and requiring SDSP officials to refrain from subjecting Bell to retaliation or unlawful adverse effects stemming from the lawsuit. *Bell v. Young*, 4:16-CV-04046, Docs. 140-1, 141. About eight months later, Bell filed a motion to enforce the settlement agreement, alleging that SDSP officials violated the settlement by discussing plans within his hearing to transfer him to A Floor, a location within SDSP used for disciplinary purposes, and by calling him names such as "rat," "snitch," "Buddha rat," and "lawyer rat." *See Bell v, Young*, 4:16-CV-04046, Doc. 149 at 8. Prison officials argued that name-calling and discussions of plans of relocation did not constitute retaliation. *Id.* On October 31, 2019, Magistrate Judge Veronica L. Duffy granted Bell's motion in part, finding that "unlawful adverse effects" covered conduct beyond the narrower definition of retaliation argued for by prison officials and requiring all prison employees who had contact with Bell to reprint and sign the relevant paragraph of the settlement agreement. *Id.* at 8-9.

On August 21, 2020, Bell sought a writ of mandamus to enforce the October 31, 2019, order and the settlement agreement. *Bell v Young*, 4:16-CV-04046, Doc. 160. Bell alleged that defendants denied him delivery of a legal resource book, took his legal work and disclosed the

3

information contained within to prison staff, including defendants in that lawsuit, and prison

inmates, rejected issues of a magazine to which he subscribed, and interfered with his facilitation

of a Buddhist group at SDSP. *Bell v. Young*, 2020 WL 7127133, at *4. Bell claimed that all of

these actions were retaliation in breach of the settlement agreement. *Id.* He also alleged that the

transfer discussions and name-calling had not stopped. *Id.* at *5. Magistrate Judge Duffy ruled

that a writ of mandamus was not warranted and liberally construed Bell's filing as a second

motion to enforce settlement. *Id.* at *3. Magistrate Judge Duffy found "no evidence of animus

toward Mr. Bell rooted in his prosecution of the underlying lawsuit" with regard to the rejection

of his legal resource book and thus found that the book rejection did not violate the settlement

agreement. *Id.* at *6. Magistrate Judge Duffy came to similar conclusions regarding the seizure

of his legal work, the rejection of his magazine issues, and the allegations of religious

interference. *See id.* at *6-10. For each of these allegations, Magistrate Judge Duffy noted that a

standalone claim for a constitutional violation was "outside the scope of this motion to enforce

the settlement agreement" and that "[i]f Mr. Bell wishe[d] to pursue a [constitutional] claim

based on these facts, he must initiate a new case." *See id.*

As to Bell's allegations of further retaliation, Magistrate Judge Duffy stated that "the

court considers not whether Mr. Bell has been the subject of any retaliation, but *only* whether

Mr. Bell has been the subject of retaliation or unlawful adverse effects *arising from his*

*participation in the underlying lawsuit*, which ended on February 5, 2019." *Id.* at *16. In

answering this narrow question, Magistrate Judge Duffy held that "[c]onsidering the large

amount of time between the conclusion of his case and the alleged actions of SDDOC, Mr. Bell

has not shown that any adverse effects he has suffered arise from his participation in the

4

underlying lawsuit." *Id.* The Court again noted that Bell "must initiate a new case" if he wished to pursue standalone constitutional claims based on the alleged facts. *Id.*

Bell filed the current lawsuit on August 2, 2021. Doc. 1. In his complaint, he alleges that the name-calling and other retaliatory conduct have not ceased and that the retaliation increased when he signed the settlement agreement. *See id.* at 10, 23. Bell alleges that the retaliation is both for his previous lawsuit and for his use of the prison grievance system. *See id.* at 18, 37. He claims that his First Amendment free exercise rights have been violated by SDSP officials' denial of Buddhist materials and harassment. *Id.* at 13-14, 37. He also brings this claim under RLUIPA. *Id.* at 14. He alleges that his First Amendment free speech rights have been violated by prison policies that denied him access to literature. *Id.* at 13-14. Specifically, he claims to have been denied issues of a Buddhist magazine titled <u>Lion's Roar</u>, a prison litigation self-help book, and a World War II magazine. *Id.* at 13. Bell alleges that his Fourteenth Amendment right to equal protection has been violated by SDSP officials' refusal to allow Buddhist materials. *Id.* at 14. He claims that his religious materials are not delivered to him while Christian religious materials are delivered to other inmates. *Id.* at 14.

Defendants deny that they ever discussed plans to move Bell to A Floor within his hearing. Doc. 52 ¶ 12. They also deny that they called Bell a rat, snitch, or other names. *Id.* ¶ 13. Instead, defendants argue that the only person SDSP officials ever heard call Bell a rat was Bell himself and that Bell would make such comments in the hallways where other inmates were present. *Id.* ¶ 14. Bell disputes these allegations, citing his filed grievances, an affidavit submitted in November 2021, and an affidavit submitted in opposition to defendants' motion for summary judgment as evidence. Doc. 58 ¶¶ 12-14.

Bell alleges that SDSP staff discussed moving him and labelled him a rat between October 14, 2021, and October 17, 2021. Doc. 59-1 ¶ 10. He alleges that SDSP staff call him "other negative and disrespectful things" over the prison radio communications. *Id.* He also alleges that they mention his lawsuit and his religion and that SDSP records these audio communications. *Id.* Bell has submitted dozens of grievances submitted to SDSP between December 2019 and July 2021 in which he complains of, among other issues, name-calling by prison staff, staff discussion of moving his housing location and transferring him to another prison, and other actions that he alleges are retaliatory. *See generally* Docs. 1-1, 4-1. In many of these grievances, Bell allege that he is called names such as "snitch," "rat," "Buddha rat," and others and that SDSP staff openly discuss retaliating against him and moving him to A Floor. *E.g.*, Doc. 4-1 at 25-28. He alleges that there have been months where this retaliation occurs daily. *See id.* at 28. He also alleges that SDSP staff discuss plans to move him to A Floor with other inmates and that they call him names in front of other inmates, including an inmate named Lamont Hamilton. *Id.* at 11-12, 17-18, 28, 86.

In one instance, Bell claims that on March 17, 2020, while he was in the utility room, Hamilton entered while Buol was at the door. *Id.* at 40. Hamilton told Buol to lock him and Bell in the utility room for ten minutes. *Id.* Bell alleges that Buol declined and said that "[t]here would be too much blood." *Id.* He claims that this is evidence of "collusion with prison inmates to intimidate, retaliate, and harass[.]" *Id.* In another instance, Bell alleges that on February 6, 2021, Swygert conducted a half-hour shakedown of Bell's cell and confiscated Bell's legal notes that he used for litigation. *Id.* at 50. According to Bell, Swygert told him that he "will not be getting them back." *Id.* Bell received an Informal Resolution Response in which he was told that "it was determined that your notes consisted of staff names and times which was [sic] then

6

placed in the officer's office." *Id.* at 51. In an Administrative Remedy Response, Bell was told

that the notes "were thought to be contraband" and accidentally thrown away. *Id.* at 47. This

response emphasized "[t]he importance of processing minor contraband as evidence, even if it's

believed to be trash" and assured Bell that steps were taken to "ensure this does not happen to

anyone moving forward." *Id.* Because Bell's legal notes had been thrown away, they were not

returned. *Id.* Bell's legal notes were also seized on August 2, 2020, because they contained SDSP

staff names, but those notes were returned once SDSP staff determined they were not a security

risk. *Id.* at 34-35. Many of Bell's other grievances were rejected because he failed to include

"evidence such as dates/times/names so that staff may investigate." *See, e.g., id.* at 77.

SDSP's responses to Bell's grievances uniformly deny all allegations of name-calling,

threats to move, and other retaliatory behavior. *See, e.g.*, Doc. 4-1 at 7. In some instances,

grievance responses state that SDSP staff reviewed prison radio and camera footage to determine

that no name-calling or threats occurred. *See id.*

Bell submits an affidavit from Anthony Reyes, a fellow inmate. Doc. 60. Reyes claims

that prison staff comment on Bell's lawsuit and grievances "on a regular basis . . . to retaliate and

intimidate Shane Bell for exercising his constitutional rights." *Id.* 4. Reyes also claims that he

was going to sign an affidavit in September 2020 supporting Bell's claims but that he chose not

to out of fear of retaliation. *Id.* ¶ 5. Reyes states that he did not "want to get involved because

[he] may be retaliated against like Shane Bell has been from prison staff and inmates." *Id.* Reyes

signed the submitted affidavit on November 17, 2021. *Id.* at 3.

Bell also submits an affidavit from Joseph Smalls, a fellow inmate who was Bell's

cellmate for the three months prior to signing this affidavit. Doc. 61-9 ¶ 1. Smalls claims that he

has witnessed SDSP staff treat Bell "in an unprofessional, discriminitive [sic], vindictive, and

retalitory [sic] manner." *Id.* ¶ 2. He claims that he has frequently heard SDSP staff discussing Bell's previous lawsuit with inmates and "slandering" Bell. *Id.* ¶ 3. Smalls alleges that Correctional Officer Swenson, who is not a defendant in this lawsuit, referred to Bell as an "asshole" during the second week of January 2020. *Id.* ¶ 4. He also alleges that SDSP staff have kept Bell locked in during work hours while other inmates with similar prison jobs were allowed to work, have prevented Bell from taking "worker's showers," a benefit of being a worker inmate, while other worker inmates were allowed to take such showers, and have released other inmates for the Buddhist group meetings but not Bell, despite it being common knowledge that Bell is head facilitator for the Buddhist group. *Id.* ¶ 5.

Smalls claims that Bell's requests for informal resolution request forms, administrative remedy request forms, and grievance forms have repeatedly been denied by Ekeren. *See id.* ¶ 6. He claims that on January 27, 2020, Bell was written up by Ekeren without being served and without being provided an opportunity to make a statement in violation of SDSP policy and that Bell's request for remedy and grievance forms regarding this writeup were denied. *See id.* ¶ 7. He also claims that Bell was placed on cell restriction for six days, preventing him from using the phone, attending recreation, and attending the Buddhist group. *Id.* ¶ 8. Smalls also states that he was reluctant to provide this affidavit for fear of retaliation because he can "see what Bell apparrently [sic] must endure." *Id.* ¶ 9.

Ekeren, who served for some period of time as Unit Manager for Unit B in SDSP, claims that Bell would visit his office "at least twice a week" to ask if he was being transferred or moved to a different unit. Doc. 52 ¶ 47. Ekeren states that he would always tell Bell that he was not being transferred or moved. *Id.* ¶ 48. Bell "admits only that he would periodically inquire whether there were plans to make good on the threat to transfer him." Doc. 58 ¶ 47. At one point,

Young asked Bell if he wanted to be sent out of state. Doc. 1 at 12; Doc. 52 ¶ 68. In his complaint, Bell alleges that Young said transferring Bell "would make it easier for [Young]." Doc. 1 at 12. Defendants claim that Young asked Bell if he might feel "safer somewhere else." Doc. 52 ¶ 68. Bell claims that he took this to be a threat, but defendants argue that this was not intended as a threat. *See* Doc. 52 ¶ 68; Doc. 58 ¶ 68.

Bell alleges that SDSP staff's denial of Buddhist materials violated his First Amendment free exercise rights, and he also brings this claim under RLUIPA. Doc. 1 at 13-14. The September 2020, March 2021, and May 2021 issues of Lion's Roar were rejected by SDSP staff as "sexually explicit." Doc. 52 ¶¶ 92-93. The 2021 issues were placed in the SDSP viewing room, where Bell would only have access to them for 20 minutes at a time, and the September 2020 issue was thrown out, as SDSP only implemented the viewing room policy in November 2020. *See id.* ¶¶ 92-97. Bell argues that one of the rejected magazine issues contained no nudity and that the other issues were not sexually explicit, rendering SDSP's rejection of those issues unconstitutional. Doc. 58 ¶¶ 93-94. Bell also claims that a third issue of Lion's Roar has been withheld other than the September 2020 issue that was thrown out. *Id.* ¶ 111. Bell acknowledges that he has been provided access to the issues of Lion's Roar in the viewing room but claims that he is prevented from bringing in pen and paper or otherwise taking notes as to the content of each magazine. *Id.* ¶¶ 107-108. Defendants note that under SDSP policy, Bell has access to the viewing room for 20 minutes a day, but Bell asserts that in practice his access is closer to 20 minutes per week. Doc. 52 ¶ 109; Doc. 58 ¶ 109. Defendants also note that Bell has received "the vast majority" of issues of Lion's Roar, and Bell claims that the frequency with which he does not receive issues that have been sent to him has increased since he sought additional relief

in his prior suit and since he filed the present suit. Doc. 52 ¶ 111; Doc. 58 ¶ 111. Lion's Roar is published bimonthly. *See* Doc. 52 ¶ 114.

Defendants state that Bell and other Buddhist SDSP inmates have access to "a multitude of other publications regarding [Buddhism] that do not contain depictions of nudity." *Id.* ¶ 116. The locker of Buddhist materials contains approximately 50 books and 20 discs pertaining to Buddhism. *Id.* ¶¶ 117-118. Defendants also state that Bell is free to request other religious books and publications as long as they comply with SDSP policy. *Id.* ¶ 119. Defendants argue that there is nothing in the record that suggests Lion's Roar is "required reading for those who profess to practice Buddhism[,]" a statement which Bell does not dispute but claims is immaterial. *Id.* ¶ 120; Doc. 58 ¶ 120. Defendants further argue that Lion's Roar, unlike the Bible or Quran, is not required reading and that they are aware of no authority which would consider Lion's Roar to contain "critical religious instruction without which Buddhist inmates [could not] practice their faith." Doc. 52 ¶ 121. Bell claims that this statement is improper expert testimony offered by individuals not qualified to address the issue. Doc. 58 ¶ 121. Defendants state that religious groups at SDSP, including the Buddhist group, are permitted to worship together for two 90-minute sessions a week. Doc. 52 ¶¶ 125-126. Bell acknowledges that SDSP policy permits this amount of worship but argues that he is not granted this amount of time per week in practice. Doc. 58 ¶¶ 125-126.

Bell alleges that SDSP mail staff's denial of issues of Lion's Roar, a legal reference book titled Disciplinary Self-Help Litigation Manual, and a World War II magazine violated his First Amendment free speech rights. Doc. 1 at 13-14. After the World War II magazine was rejected as sexually explicit, Bell filed an Informal Resolution Request on October 8, 2020, in which he argued that the SDSP pornography policy was unconstitutional. Doc. 52 ¶ 130. Bell argues that

10

the magazine was rejected because of a series of paintings called the Hiroshima Panels, which he claims are not lewd or sexually explicit. Doc. 58 ¶ 132. The legal reference book was rejected around February 18, 2020, because it was mailed to SDSP in an envelope with an adhesive address label, which violated SDSP policy. Doc. 52 ¶¶ 136-137. Defendants note that the purpose of this policy is to prevent illegal drugs from being introduced into the prison through stickers. *Id.* ¶ 142. Defendants argue that while an exception exists to this policy for religious, educational, or privileged content, Miller-Hunhoff, who screened the legal reference book mailing, had no reason to believe that the "Human Rights Defense Center[,]" who mailed the book, fell into this exception. Doc. 52 ¶¶ 153, 155. Bell disputes this assertion, arguing that a reasonable person in Miller-Hunhoff's position would have reason to believe that the material was educational because of the name of the sender and book, and he further argues that this dispute justifies discovery on this issue. Doc. 58 ¶¶ 153-155.

Bell claims that "his Fourteenth Amendment right to equal protection has been violated by SDSP staff's refusal to allow Buddhist materials. Doc. 1 at 14. He claims that SDSP refuses to allow delivery of his Buddhist materials while allowing other religious materials and practices. *Id.* Bell alleges that the Christian Bible, which he believes contains sexually explicit material, is allowed in SDSP, but his Buddhist publication was not allowed. Doc. 52 ¶ 146. Defendants argue that Bell's equal protection claim is premised on this assertion and that he has not otherwise shown that he has been treated differently than similarly situated inmates because SDSP staff have applied the pornography and mail policies in question equally to adherents of all religions. *Id.* ¶¶ 145-146. Bell argues that the Christian Bible is not the only basis of his equal protection claim but that discovery is required to reveal further instances of different treatment. Doc. 58 ¶¶ 145-146.

## II. Bell's Motion for Leave to Amend Complaint

Bell has filed a motion for leave to amend his complaint. Doc. 54. In his amended complaint, Bell brings a new state-law breach of contract claim. Doc. 54-1 ¶¶ 62-67. He seeks to add Kellie Wasko, the current South Dakota Secretary of Corrections, as a defendant in her official capacity. *See id.* at 2. He also seeks additional forms of preliminary and permanent injunctive relief not stated in his initial complaint. *Id.* ¶¶ 98-100. Last, Bell seeks to add Ponto to his equal protection claims against Young and Miller-Hunhoff. *See id.* ¶¶ 96-97. Defendants resist this motion, arguing that it should be denied for undue delay and dilatory motive and that the additional claim Bell seeks to bring is futile. Doc. 56 at 3-8.

Under Federal Rule of Civil Procedure 15(a)(1), "[a] party may amend its pleading once as a matter of course within 21 days after serving it," or 21 days after service of a responsive pleading or motion. Thereafter, the party may amend only with the written consent of the opposing party or the court's permission. Fed. R. Civ. P. 15(a)(2). Because Bell's motion for leave to amend complaint was filed more than 21 days after the defendants answered his complaint and because defendants oppose his motion, Bell must have leave from the Court to amend. *See id.* "The court should freely give leave [to amend] when justice so requires." *Id.* Even under this generous standard, a court may deny a request to amend for "compelling reasons such as undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of the amendment." *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 715 (8th Cir. 2008) (quoting *Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1065 (8th Cir. 2005)).

"A liberal amendment policy, however, is in no way an absolute right to amend. Where an amendment would likely result in the burdens of additional discovery and delay to the proceedings, a court usually does not abuse its discretion in denying leave to amend." *Popp Telcom v. Am. Sharecom, Inc.*, 210 F.3d 928, 943 (8th Cir. 2000) (internal citation omitted). "When late tendered amendments involve new theories of recovery and impose additional discovery requirements, appellate courts are less likely to hold a district court abused its discretion." *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 497 (8th Cir. 2008) (citation omitted). Further, a "[d]enial of a motion for leave to amend on the basis of futility means the district court has reached the legal conclusion that the amended complaint could not withstand a motion to dismiss under Rule 12(b)(6)." *Moody v. Vozel*, 771 F.3d 1093, 1095 (8th Cir. 2014) (internal quotation omitted) (quoting *Zutz v. Nelson*, 601 F.3d 842, 850 (8th Cir. 2010)). Under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Defendants state that this Court appointed counsel to represent Bell on October 20, 2021, and that Bell was given until January 4, 2022, to effectuate service on the remaining unserved defendants. Doc. 56 at 3-4. Despite this, Bell did not seek to amend his complaint during this window. *Id.* at 4. Further, defendants' counsel states that, on January 28, 2022, he notified Bell's counsel by email that defendants intended to file a motion for summary judgment. *Id.* Bell's counsel responded to this email but made no mention of filing an amended complaint. *Id.* Defendants note that Bell's counsel waited until February 11, 2022, to mention any intention of filing an amended complaint, and only did so in response to defendants' motion to exceed page limitations. *Id.* Defendants argue that there has been no showing as to why the amended complaint could not have been filed earlier. *Id.* at 4-5.

Bell argues that the liberal standard under Rule 15(a) applies because the Court had not yet set a deadline for amending pleadings at the time that he filed his motion for leave to amend. Doc. 66 at 2. Bell notes that the cases cited by defendants apply after a scheduling order is entered under Federal Rule of Civil Procedure and that prior to such a scheduling order, no showing of good cause is required. *Id.* Bell further argues that he has no duty to "give his adversary advanced notice" of his intent to file an amended complaint. *Id.* at 3. He states that defendants filed a single answer on January 31, 2022, and that he began working on his amended complaint thereafter. *Id.* at 5. He also states that defendants have made no showing that prejudice would occur if the motion for leave to amend is granted. *Id.* at 4. Bell is correct that the Rule 15(a) standard applies. Bell's motion for leave to amend requires the Court's leave and should be granted "when justice so requires." *See* Fed. R. Civ. P. 15(a)(2). This Court finds that defendants have shown no "compelling reasons" as required by *Sherman* to deny leave to amend.

Defendants next argue that Bell's state-law breach of contract claim is futile under the law of the case doctrine. Doc. 56 at 5-7. Defendants note that Bell failed to appeal Magistrate Judge Duffy's denial of his second motion to enforce settlement. *Id.* at 6. Thus, they argue that "[u]pon expiration of the time allowed for appeal, the judgment or order becomes the law of the case as to the parties." *Id.* (quoting *Little Earth of the United Tribes, Inc. v. U.S. Dep't of Hous. and Urb. Dev.*, 807 F.2d 1433, 1411 (8th Cir. 1986)). Bell responds that the law of the case doctrine is not applicable here because it applies to "the same issues in subsequent stages in the same case." Doc. 66 at 7 (quoting *Morris v. Am. Nat'l Can Corp.*, 988 F.2d 50, 52 (8th Cir. 1993)). Bell notes that, although the two cases are related, this is not the same case as that in which Magistrate Judge Duffy denied Bell's second motion to enforce settlement. *Id.* Bell is correct that the doctrine is not applicable because these are separate cases. *See Edmonds v. Smith*,

14

922 F.3d 737, 739 (6th Cir. 2019) ("The defining feature of the law-of-the-case doctrine is that it applies only within the same case.").

Defendants argue that res judicata and collateral estoppel prevent Bell from relitigating these issues. Doc. 56 at 7-8. "Claim preclusion, or res judicata, 'bars relitigation of the same claim between parties or their privies where a final judgment has been rendered upon the merits by a court of competent jurisdiction.' " *Plough ex rel. Plough v. W. Des Moines Cmty. Sch. Dist.*, 70 F.3d 512, 517 (8th Cir.1995) (quoting *Smith v. Updegraff*, 744 F.2d 1354, 1362 (8th Cir. 1984)). Because Bell's allegations that defendants have breached the settlement agreement include new behavior since Magistrate Judge Duffy's ruling, this is a new claim and res judicata does not apply.

Issue preclusion, or collateral estoppel, has five elements:

(1) the party sought to be precluded in the second suit must have been a party, or in privity with a party, to the original lawsuit; (2) the issue sought to be precluded must be the same as the issue involved in the prior action; (3) the issue sought to be precluded must have been actually litigated in the prior action; (4) the issue sought to be precluded must have been determined by a valid and final judgment; and (5) the determination in the prior action must have been essential to the prior judgment.

*Olsen v. Mukasey*, 541 F.3d 827, 830-31 (8th Cir. 2008) (citing *Robinette v. Jones*, 476 F.3d 585, 589 (8th Cir. 2007). The Eighth Circuit Court of Appeals has explained that "where the court in the prior suit has determined two issues, either of which could independently support the result, then neither determination is considered essential to the judgment[.]" *Lovilia Coal Co. v. Harvey*, 109 F.3d 445, 453-54 (quoting *Ritter v. Mount St. Mary's Coll.*, 814 F.2d 986, 993 (4th Cir. 1987)). Magistrate Judge Duffy found both that defendants' actions were not unlawful adverse effects and that they were too removed in time from the prior lawsuit to be motivated by that lawsuit. *Bell*, 2020 WL 7127133, at *15-16. Because either of these findings would independently support the result that defendants did not breach the settlement agreement, the

findings are not essential to the judgment and cannot have a preclusive effect under *Lovilia Coal Co.*

Defendants raise no argument that the remainder of Bell's amended complaint, which adds Wasko in her official capacity as a defendant to all claims, adds Ponto as a defendant to Bell's equal protection claim, and seeks additional forms of injunctive relief, is futile. *See* Doc. 56 at 5-8. Thus, Bell's motion for leave to amend complaint, Doc. 54, is granted.

## III. Defendants' Motion for Summary Judgment

### A. Legal Standard

The Court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A summary judgment motion must be supported by evidence on the record, which may include affidavits or declarations based upon personal knowledge. Fed. R. Civ. P. 56(c). The non-moving party is entitled to the benefit of having all reasonable inferences resolved in his or her favor, but the non-moving party must present specific facts showing a genuine issue for trial. *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1207 (8th Cir. 2013) (citation omitted). That is, a non-moving party must present "sufficient probative evidence" capable of supporting a finding in his or her favor, not "mere speculation, conjecture, or fantasy." *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992) (en banc) (quoting *Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 681 (9th Cir. 1985)).

Section 1983 creates civil liability for a person who, acting under the color of state law, deprives another of his or her federal constitutional or statutory rights. 42 U.S.C. § 1983. However, "[q]ualified immunity shields a government official from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of

which a reasonable person would have known." *Partlow v. Stadler*, 774 F.3d 497, 501 (8th Cir. 2014) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When an official capacity claim is asserted for injunctive relief against a state officer, the defense of qualified immunity does not apply. *See Pearson v. Callahan*, 555 U.S. 223, 242-243 (2009).

"To overcome the defense of qualified immunity, the plaintiff must show: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Howard v. Kan. City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009). For a right to be "clearly established[,]" "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "Clearly established" law cannot be demonstrated at a high level of generality; rather, it must put officers on "fair notice." *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 613, 616 (2015) (citations omitted). To show that a right was clearly established, the plaintiff must provide either "controlling authority . . . which clearly established the rule on which [he or she] seek[s] to rely" or "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999).

## B. Legal Analysis

### 1. First Amendment Retaliation Claim

To establish a retaliation claim, Bell must show "(1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Spencer v. Jackson County*, 738 F.3d 907, 911 (8th Cir.

2013) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)). In order to succeed on a retaliation claim, a plaintiff must show that the "adverse action taken against him was 'motivated at least in part' by his protected activity[.]" *Id.* (quoting *Revels*, 382 F.3d at 876). Although "[t]he causal connection is generally a jury question, . . . it can provide a basis for summary judgment when the question is so free from doubt as to justify taking it from the jury." *Beaulieu v. Ludeman*, 690 F.3d 1017, 1025 (8th Cir. 2012) (alteration and omission in original) (quoting *Revels*, 382 F.3d at 876).

The Eighth Circuit has an established rule that "an act in retaliation for the exercise of a constitutionally protected right is actionable under [§] 1983 even if the act, when taken for a different reason, would have been proper." *Madewell v. Roberts*, 909 F.2d 1203, 1206 (8th Cir. 1990) (quoting *Freeman v. Blair*, 793 F.2d 166, 178 (8th Cir. 1986), *vacated on other grounds*, 483 U.S. 1014 (1987)); *see also Cooper v. Schriro*, 189 F.3d 781, 784 (8th Cir. 1999) (per curiam) (finding inmate's allegation that staff shut off his water for five days and threatened his safety because the inmate used the prison grievance system was sufficient to state a retaliation claim); *Sanders v. St. Louis County*, 724 F.2d 665, 666 (8th Cir. 1983) (per curiam) (finding that prison officials may not impede access to courts through retaliation, such as threats, harassment, or less favorable treatment, for inmate's litigation activities). "[T]he alleged manifestations of defendants' retaliation (such as less favorable treatment) need not themselves amount to constitutional violations. The violation lies in the *intent* to impede access to the courts." *Madewell*, 909 F.2d at 1206-07 (citing *Sanders*, 724 F.2d at 666).

Defendants argue that the alleged actions do not constitute adverse action. Doc. 36 at 17-24. Specifically, they argue that "[v]erbal threats and name-calling usually are not actionable." *Id.* at 17 (quoting *Ayotte v. Barnhart*, 973 F. Supp. 2d 70, 94 (D. Me. 2013). They cite several

cases for the proposition that being labeled a "rat" or "snitch" does not constitute an adverse action. *Id.* at 18-19. Defendants also argue that a transfer from one prison to another is not an adverse action, so threats of transfer cannot be adverse actions. *Id.* at 20-22.

Bell argues that defendants "minimize the severity of the allegations" by focusing exclusively on name-calling. Doc. 63 at 7. He argues that the alleged retaliation includes "destroying his personal property, singling him out for cell searches and review of his legal material, [and] intimidating prospective witnesses[,]" and that the name-calling created an environment in which SDSP officials were given a free pass to engage in these acts. *Id.* at 8. He further argues that "this is not a case of 'name-calling,' without more, but rather a case of concerted, coordinated activity against Bell that is undertaken in retaliation for his lawsuit and subsequent protected activity." *Id.* at 10. Bell also notes that labels such as "rat" and "snitch" pose a heightened risk to inmates and that the Eighth Circuit "has previously held that a prison official is 'on fair notice that to falsely label an inmate a snitch is to unreasonably subject that inmate to the threat of a substantial risk of serious harm at the hands of his fellow inmates.' " *Id.* at 11 (quoting *Irving v. Dormire*, 519 F.3d 441, 451 (8th Cir. 2008)). Bell argues that because such labeling meets the higher bar of an Eighth Amendment cruel and unusual punishment claim, "it should prove more than sufficient to constitute an 'adverse action' in the retaliation context." *Id.* at 12.

As to threats of transfer, Bell argues that "retaliatory conduct does not itself need to be a constitutional violation in order to be actionable." *Id.* at 11 (quoting *Cody v. Weber*, 256 F.3d 764, 771 (8th Cir. 2001)). He further argues that the threat of transfer alone is sufficient for a First Amendment retaliation claim if that threat was made in retaliation for constitutionally protected activity. *Id.* at 14 (citing *Burgess v. Moore*, 39 F.3d 216, 218 (8th Cir. 1994)).

19

Here, Bell has made a sufficient showing that the conduct in question, if it occurred, constitutes retaliation in violation of the First Amendment. *Irving* recognized the threat posed to an inmate when labeled a snitch. 519 F.3d at 451. In *Reeves v. King*, the Eighth Circuit further explained this threat, stating that "[t]he focus of 'snitch' cases is the possibility of retaliation by other inmates." 774 F.3d 430, 433 (8th Cir. 2014). This risk is greatest when prison staff label an inmate a snitch in front of other inmates and when the labeled inmate has acted "in contravention to the interests of other inmates[.]" *See id.* at 432-33. Bell alleges that he has been called names such as "rat" and "snitch" in front of other inmates and that in one instance, Buol joked about allowing another inmate, Hamilton, to harm him. Doc. 4-1 at 11-12, 17-18, 25, 40, 86. Although most of Bell's grievances do not demonstrate that he acted in contravention to the interests of other inmates, he alleges that prison staff label him a snitch to other inmates. *See id.* at 11-12, 17-18, 25, 86. Further, he alleges that he has been retaliated against and labelled a snitch in part because he submitted a grievance regarding his interaction with Buol and Hamilton. *See id.* at 40.

Eighth Circuit precedent is clear regarding threats of retaliatory transfer. "[A] prisoner enjoys no constitutional right to remain in a particular institution." *Saylor v. Nebraska*, 812 F.3d 637, 646 (8th Cir. 2016) (quoting *Goff v. Burton*, 7 F.3d 734, 737 (8th Cir. 1993)). A prisoner may be transferred "for whatever reason or for no reason at all." *Id.* (quoting *Goff*, 7 F.3d at 737). But "retaliation against a prisoner cannot be the motivation behind the transfer." *Id.* (citing *Goff*, 7 F.3d at 737). Thus, under Eighth Circuit law, a retaliatory transfer is a constitutional violation. Further, "a threat of retaliation is sufficient injury if made in retaliation for an inmate's use of prison grievance procedures." *Burgess*, 39 F.3d at 218. Bell alleges that defendants called him names such as rat and snitch, threatened to transfer him to a higher-security portion of SDSP and to another prison, and engaged in other targeted and retaliatory behavior because of his

previous litigation and his use of the prison grievance system. These allegations, if true, constitute retaliation in violation of Bell's First Amendment rights.

Defendants argue that the alleged actions have been found to not be "unlawful adverse action" by Magistrate Judge Duffy's ruling in the previous lawsuit. Doc. 36 at 20 (citing *Bell*, 2020 WL 7127133, at *15). They further argue that because Bell did not appeal Magistrate Judge Duffy's denial of his petition for a writ of mandamus, the law of the case doctrine precludes him from bringing further retaliation claims regarding these allegations. *Id.* at 23-24. Defendants also argue that when a case is " 'clearly a continuation of plaintiff's claims' and 'the wrongs sought to be redressed by plaintiff in the instant action are the same as those actually litigated in [plaintiff's related case][,]' " the complaint should be dismissed on collateral estoppel grounds because the new claims stem from the same nucleus of operative facts. Doc. 68 at 7 (first alteration in original) (quoting *Irving v. Dormire*, 2009 WL 1588669, at *3 (W.D. Mo. June 8, 2009)). As discussed above, the law of the case doctrine does not apply here because this is not the same case. *See Morris*, 988 F.2d at 52; *Edmonds*, 922 F.3d at 739. Similarly, Magistrate Judge Duffy's denial of Bell's petition for writ of mandamus and second motion to enforce settlement has no preclusive effect because neither of the two alternative holdings were necessary to the judgment. *See Lovilia Coal Co.*, 109 F.3d at 453-54.

Defendants next argue that Bell's allegations of retaliation are false. Doc. 36 at 10-17, 22-23. They "strenuously deny any and all assertions being made" by Bell regarding name-calling and plans to move or transfer him. *Id.* at 12. They further cite to the affidavits of several defendants for the proposition that if Bell's allegations were merited, SDSP staff would have dealt with the problem in accordance with SDSP policy. *Id.* at 12-15 (citations omitted). Defendants explain that the alleged behavior violates various SDSP policies, such as the policy

prohibiting staff from "engaging in conduct that reflects unfavorably on the DOC." *See id.* at 13 (citations omitted). They also argue that SDSP staff "question[ed] those individuals identified by Bell as having engaged in the alleged behavior" and that "[w]hen questioned, those individuals denied that any such behavior ever took place." *Id.* at 16 (citations omitted). Defendants claim that, "other than his conclusory and self-serving allegations, Bell has not and cannot provide the Court with any evidence to support his claims." *Id.* at 17 (citation omitted).

Bell disputes this contention, stating that his grievances and allegations alone are "sufficient to create a factual dispute relating to whether the conduct occurred and as to how it is characterized." Doc. 63 at 9. Bell points to the affidavits from Smalls and Reyes which support his allegations. *Id.* Both Smalls and Reyes provide testimony in their affidavits that Bell has been the victim of retaliation at SDSP and that they were hesitant to come forward because of the possibility of retaliation. Doc. 60 ¶¶ 3-5; Doc. 61-9 ¶¶ 2-9.

Genuine disputes of material fact exist regarding whether the alleged actions occurred. Bell's grievances, submitted contemporaneously in response to the alleged actions, are evidence, as are the affidavits from Smalls and Reyes. Although defendants characterize this evidence as conclusory and self-serving, defendants only put forth their own affidavits, an affidavit from another SDSP staff member, and the argument that if any misconduct had occurred, it would have been recorded by SDSP staff as per SDSP policy. Bell correctly summarizes defendants' argument as "asking that the Court ignore Bell's evidence and accept at face value [defendants'] denial that such misconduct occurred[.]" Doc. 63 at 10. Thus, genuine disputes of material fact exist as to whether these actions occurred.

Defendants argue that Bell has failed to establish the third element of a retaliation claim because he has failed to "show that, 'but for' the retaliatory motive, the disciplinary action would

not have been taken." Doc. 36 at 24-25 (quoting *Gard v. Dooley*, 2016 WL 5376236, at *32 (D.S.D. Mar. 4, 2016)). But defendants cite to the standard for a retaliatory discipline claim, which is not the claim being brought by Bell here. *See Gard*, 2016 WL 5376236, at *32 (citing *Haynes v. Stephenson*, 588 F.3d 1152, 1156 (8th Cir. 2009)). Instead, Bell need only show that "the adverse action was motivated at least in part by the exercise of the protected activity." *Spencer*, 738 F.3d at 911 (quoting *Revels*, 382 F.3d at 876).

Defendants' only argument on this element is that Magistrate Judge Duffy's prior ruling found that "the actions alleged by Bell are, in relation to the underlying lawsuit, too remote in time to suggest they were motivated by or arose from it." Doc. 36 at 25 (quoting *Bell*, 2020 WL 7127133, at *16). As stated above, Bell alleges that he has been retaliated against for not only the previous lawsuit but also for his use of the prison grievance system. Further, the "causal connection is generally a jury question[.]" *Beaulieu*, 690 F.3d at 1025. Thus, whether the retaliation alleged by Bell was motivated by protected First Amendment activity is a question for the jury.

Defendants argue that Bell has not been deterred from continuing to file prison grievances. Doc. 36 at 26-28. They argue that Bell "must show that (1) the threat was sufficiently serious that it would deter a reasonable inmate of ordinary firmness from lodging a grievance and (2) that the threat actually did deter this particular inmate." *Id.* (quoting *East v. Minnehaha County*, 2019 WL 1434974, at *22 (D.S.D. Mar. 29, 2016)). Bell correctly states that defendants are articulating the wrong standard. Doc. 63 at 15-16. The standard quoted for defendants articulates "the two-part test that an inmate must meet to excuse the failure to exhaust remedies under the Prison Litigation Reform Act ("PLRA") on grounds that administrative remedies were unavailable because of retaliation or intimidation by prison officials." *Id.* at 16; *See East*, 2019

WL 1434974, at *22 (describing the "two-part test to show that intimidation made the prison's administrative remedies unavailable").

Defendants cite several cases from outside this district in which courts have found that the continued filing of grievances by inmate plaintiffs sufficed as evidence that a reasonable prisoner of ordinary firmness would not have been deterred. Doc. 36 at 26-28 (citations omitted). But these cases are not controlling on this Court, and some of these cases deal with the failure to exhaust administrative remedies standards incorrectly stated by defendants rather than the standard for a retaliation claim. *See, e.g., Jackson v. Carter*, 813 F. App'x 820, 823 (3d Cir. 2020) (per curiam). Defendants go as far as to suggest that "the most recent lawsuit" shows that Bell has not been deterred, and this Court wonders how Bell is to pursue relief if the filing of this lawsuit is evidence that his retaliation claims are without merit. Bell's allegations, if true, are sufficient to chill a reasonable prisoner of ordinary firmness from continuing in the protected activity.

Thus, because genuine questions of material fact exist regarding Bell's retaliation claim, summary judgment is denied on this claim.

## 2.  First Amendment Free Exercise and RLUIPA Claims

The First Amendment to the United States Constitution states in relevant part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" U.S. Const. amend. I. Inmates clearly retain their First Amendment rights, including the right to the free exercise of religion. *Cruz v. Beto*, 405 U.S. 319, 322 (1972). But limitations may be placed on the exercise of prisoners' constitutional rights in light of the needs of the penal system to deter crime, rehabilitate prisoners, and maintain institutional security. *O'Lone v. Est. of Shabazz*, 482 U.S. 342, 348 (1987) (citation omitted); *Murphy v. Mo. Dept. of Corr.*, 372 F.3d

24

979, 982 (8th Cir. 2004). Constitutional claims that would receive strict scrutiny in any other

setting are evaluated under a lesser standard of scrutiny in a prison setting. *Turner v. Safley*, 482

U.S. 78, 81 (1987). A prison regulation may restrict a prisoner's constitutional rights if it is

"reasonably related to legitimate penological interests." *Id.* at 89.

The threshold question for any prisoner First Amendment free-exercise claim, as well as

an RLUIPA claim, is whether prison officials have substantially burdened the plaintiff's

sincerely held religious beliefs. *Gladson v. Iowa Dep't of Corr.*, 551 F.3d 825, 833 (8th Cir.

2009). Substantially burdening one's free exercise of religion means that the regulation

> must significantly inhibit or constrain conduct or expression that manifests some
> central tenet of a [person's] individual [religious] beliefs; must meaningfully curtail
> a [person's] ability to express adherence to his or her faith; or must deny a [person]
> reasonable opportunities to engage in those activities that are fundamental to a
> [person's] religion."

*Murphy*, 372 F.3d at 988 (alterations in original) (internal quotation omitted). "When the

significance of a religious belief is not at issue, the same definition of 'substantial burden'

applies under the Free Exercise Clause . . . and RLUIPA." *Patel v. U.S. Bureau of Prisons*, 515

F.3d 807, 813 (8th Cir. 2008). But when a question as to the significance of a religious belief or

practice is at issue, courts apply the statutory definition of religious exercise found in the

language of RLUIPA. *Id.* at 813 n.7. Under this statutory definition, "[t]he term 'religious

exercise' includes any exercise of religion, whether or not compelled by, or central to, a system

of religious belief." 42 U.S.C. § 2000cc-5(7)(A). The Eighth Circuit has "hesitate[d] to make

judgments about whether a religious belief is sincere or not" and has stated that courts "must not

quickly dismiss such claims on summary judgment by concluding that those beliefs are not

genuine." *Murphy*, 372 F.3d at 983, 988.

Defendants argue that Bell has not shown a substantial burden on his ability to exercise his religion. Doc. 36 at 33-38. They cite to two courts in other districts and one court from this district that found no substantial burden when Wiccan books featuring nudity were rejected by prisons. *Id.* at 34-35 (citations omitted). They further note that Bell has received the majority of Lion's Roar magazines sent to him, that he has access to many other Buddhist publications that do not contain nudity, and that he is able to gather with the SDSP Buddhist group to worship and study. *Id.* at 36-37. Defendants also argue that the time Bell is afforded to view the rejected Lion's Roar issues in the SDSP viewing room, which they claim is 20 minutes a day and Bell contends is 20 minutes a week, is enough time because they need only allow a reasonable opportunity for religious activities, rather than unlimited opportunities. *See id.* at 37-38 (citing *Van Wyhe v. Reisch*, 581 F.3d 639, 657 (8th Cir. 2009)).

Bell argues that the nudity rejected "comes in the form of an artistic rendering of religious iconography" and that these images "are artworks or statuary that represent central aspects of Buddhist iconography." Doc. 63 at 17. He compares them to "painted depictions of Jesus as a baby with his mother and nearly every representation of Adam and Eve in the Western canon." *Id.* at 18 (footnote omitted).

Here, the significance of the religious exercise in question is in doubt. Defendants argue that restricting access to publications that contain nudity is not a substantial burden. Doc. 36 at 33-38. Defendants make no argument pertaining to Buddhism or Bell's particular religious beliefs. *See id.* Instead, defendants only argue that courts have upheld nudity bans when other plaintiffs of other religions have claimed that they were substantially burdened by those bans. *Id.* at 34-35. Thus, there is a question as to the importance of these issues of Lion's Roar to Bell's

26

religious beliefs or practices, and this Court must apply the different standards of substantial

burden found under the First Amendment and RLUIPA.

The Court finds that Bell has successfully alleged a substantial burden to his free exercise

rights under the First Amendment. Some of the images in question are "statues of the

Prajnaparamita," a "representation of the 'Wheel of Life,' " and "representations of Buddhist

deities Kannon and Vajrasattva." Doc. 63 at 17 (citations omitted). Bell reasonably alleges that

representations of deities and religious iconography are necessary for his "ability to express

adherence to his . . . faith[.]" *See Murphy* 372 F.3d at 988 (internal quotation omitted). This

Court is in no position, without discovery or further evidence, to determine that Bell is not

substantially burdened by being denied these issues of Lion's Roar.

The analysis is simpler under RLUIPA, where Bell must only show a substantial burden

to "any exercise of religion, whether or not compelled by, or central to, a system of religious

belief." § 2000cc-5(7)(A). In *Rowe v. Davis*, the Northern District of Indiana found that an

inmate plaintiff stated a claim sufficient to meet the substantial burden threshold of RLUIPA

when prison officials confiscated religious letters and reading materials because, for the plaintiff,

"reading religious literature [was] a religious exercise." 373 F. Supp. 2d 822, 825-26 (N.D. Ind.

2005). The same analysis applies here. Without discovery or further evidence, this Court cannot

determine that the denial of the issues of Lion's Roar did not substantially burden Bell under

RLUIPA.

### a. First Amendment Free Exercise Analysis

Because Bell has put forth evidence that his ability to practice his religion has been

substantially burdened, this Court applies the test outlined in *Turner*. *See Gladson*, 551 F.3d at

27

833. In *Turner*, the Supreme Court provided four factors to determine whether a prison

regulation withstands scrutiny:

> (1) whether there is a valid, rational connection between the regulation and the
> asserted governmental interest; (2) whether alternative means for exercising the
> right remain open to the prisoner; (3) the impact of the regulation on prison staff,
> other inmates, and the allocation of prison resources; and (4) the availability of
> ready alternatives to the regulation.

*Hamilton v. Schriro*, 74 F.3d 1545, 1551 (8th Cir. 1996) (citing *Turner*, 482 U.S. at 89-91).

"[P]rison officials may lawfully censor prison mail that is detrimental to the security, good order

and discipline of the institution." *Kaden v. Slykhuis*, 651 F.3d 966, 968 (8th Cir. 2011) (per

curiam) (citing *Thornburgh v. Abbott*, 490 U.S. 401, 404 (1989)). "The first factor [of Turner]

operates as a threshold condition that the regulation must satisfy to pass constitutional muster.

*Sisney v. Kaemingk*, 15 F.4th 1181, 1190 (8th Cir. 2021). "Assuming the regulation satisfies this

threshold requirement, the court must determine the regulation's constitutionality by balancing

the remaining three factors." *Id.* The *Turner* analysis is used for both as-applied challenges and

for facial challenges. *See Thornburgh*, 409 U.S. at 403-04.

Here, Bell brings an as-applied challenge. *See* Doc. 54-1 ¶¶ 84-85. Defendants argue that

SDSP's pornography policy is "the least restrictive means to further a compelling interest."[4]

Doc. 36 at 38 (quoting *Murphy*, 372 F.3d at 988). As a threshold matter, this Court must

determine if there is a valid, rational connection between the SDSP pornography policy and a

legitimate government interest. *See Sisney*, 15 F.4th at 1190. Defendants argue that "[p]rison

safety and security are compelling government interests." Doc. 36 at 40 (quoting *Singson v.*

---

[4] This is the standard for RLUIPA analysis and is a higher standard than the *Turner* standard
applied to First Amendment claims. *See Murphy*, 372 F.3d at 988. Defendants argue that
censoring Lion's Roar meets the *Turner* standard in their discussion of Bell's First Amendment
access to literature claims, where it is also applied, rather than in their discussion of Bell's First
Amendment free exercise claim. *See* Doc. 36 at 38-46.

*Norris*, 553 F.3d 660, 662 (8th Cir. 2009)). They argue that "allowing publications that feature nudity into individual cells, where they would likely be disseminated to other inmates, would substantially interfere with defendants' rehabilitation and security objectives." *Id.* at 41 (internal quotation omitted) (quoting *Shaw v. Kaemingk*, 2020 WL 6825698, at *19 (D.S.D. Nov. 20, 2020)).

In *Sisney v. Kaemingk*, this Court ruled on both as-applied and facial challenges to the policy in question. 468 F. Supp. 3d 1135, 1138 (D.S.D.). The defendants in *Sisney* rejected several items sent to the plaintiff, including an art book titled <u>Matisse, Picasso and Modern Art in Paris</u>, reproduction pictures of Michelangelo's sculptures and paintings, and a reproduction picture of Lorenzo Ghiberti's "The Creation of Adam and Eve," because they contained nudity. *Id.* This Court found that "no showing ha[d] been made that banning [the art book and reproduction pictures] [was] reasonably related to a legitimate penological objective." *Id.* at 1142.

The Eighth Circuit upheld this Court's ruling on the as-applied challenge to the art book and reproduction pictures, finding that "[a]lthough a few of the featured works include nudity, the defendants have identified none that even arguably depicts its subject lewdly or as engaged in any actual or simulated sexual acts." *Sisney*, 15 F.4th at 1193 (internal quotation omitted). Further, the Eighth Circuit noted that "[c]ommon sense does not suggest, and the defendants have offered no evidence to prove, a rational connection between banning pictures of artwork such as Michelangelo's 'David' and legitimate government interests such as security and rehabilitation." *Id.*

This Court finds that the same as-applied analysis applies here. Defendants argue that the issues of <u>Lion's Roar</u> fall under the SDSP pornography policy and that another SDSP policy

29

"expressly states that [i]nmate religious and cultural activities shall not conflict with the legitimate penological interests of the DOC or pose a risk to safety and security." Doc. 36 at 40 (internal quotation omitted). The images in question, abstract representations of nude deities or religious iconography, are akin to the artwork analyzed by the Eighth Circuit in *Sisney*. *See* 15 F.4th at 1193. The Eighth Circuit rejected arguments that any rational connection existed between banning artwork such as Michelangelo's "David" and a prison's interest in security and rehabilitation. *Id.* Thus, this Court denies summary judgment to defendants as to whether they violated Bell's First Amendment free exercise rights.

Bell seeks both money damages and injunctive relief. *Id.* Bell submitted grievances regarding rejected issues of Lion's Roar in late 2019 and early 2021. *See* Doc. 1-1 at 19, 22-23, 40. Because the Eighth Circuit did not rule on *Sisney* until October 15, 2021, there was no "controlling authority" on this issue that clearly established the rule on which Bell seeks to rely. *See Layne*, 562 U.S. at 617. Nor has Bell identified a consensus of cases of persuasive authority on this issue. *See id.*; Doc. 63 at 17-22.

Further, while the Eighth Circuit's ruling in *Sisney* does indicate that the rejection of artwork with some incidental nudity may violate the First Amendment, it did so in ruling on an as-applied challenge to specific collections of art. 15 F.4th at 1193. This Court, in its ruling in *Sisney*, noted its experience with art galleries and museums to conclude that "[t]here are very few of those gallery and museum images and books where a case could be made for a banning based on the work being sexually explicit[,] . . . [b]ut all of those images and books are not before the Court in this as applied analysis." 469 F. Supp. 3d at 1142. In other words, an as-applied challenge requires an "independent review of the evidence[,]" and the results of this review depend on the specific and unique circumstances of each rejected item. *See id.* at 1141 (quoting

30

*Murphy*, 372 F.3d at 986). Thus, because each as-applied challenge requires a new review of the evidence, a very high bar must be met to determine that the outcome of a prior as-applied challenge would clearly establish a rule for a later as-applied challenge unless the two challenges regarded identical or strikingly similar evidence. *Cf. City Union Mission, Inc., v. Sharp*, 36 F.4th 810, 818 n.3 (8th Cir. 2022) (narrowly defining the question posed by a qualified immunity analysis as "whether there was a clearly established constitutional right to free exercise within 500 feet of Margaret Kemp Park" rather than the broader question of whether there was a clearly established constitutional right "to engage in free exercise of religion within 500 feet of a park with playground equipment" (internal quotation omitted)).

Here, while the issues of <u>Lion's Roar</u>, may feature nudity similar to that challenged in *Sisney*, these are different works of art. *See* Docs. 61-3, 61-4, 61-5, 61-6, 61-7, 61-8. Because Bell's right to receive the issues in question was not clearly established when the issues were rejected, defendants are entitled to summary judgment on his individual capacity First Amendment free exercise claim for money damages. Bell's official capacity First Amendment free exercise claim for injunctive relief survives summary judgment.

### b. RLUIPA Analysis

Because Bell has made a threshold showing of a substantial burden, this Court applies strict scrutiny under RLUIPA. *See Murphy*, 372 F.3d at 988 (requiring a showing that the regulation is "the least restrictive means to further a compelling interest"). This is a "heavier burden" than that under the *Turner* analysis. *Id.* Because this Court has found that Bell's First Amendment free exercise claim survives summary judgment, his RLUIPA claim necessarily survives summary judgment because the First Amendment claim must meet a "heavier burden[.]" *See id.* Defendants correctly note that RLUIPA claims cannot be brought against

individuals in their individual capacities or in their official capacities for money damages. Doc. 36 at 31 n.7 (citations omitted); *see Van Wyhe*, 581 F.3d at 654-55, 655 n.6. This Court has already dismissed Bell's claims against defendants in their official capacities for money damages. Doc. 8 at 19. To the extent that Bell has brought an RLUIPA claim against defendants in their individual capacities, summary judgment is granted to defendants on that claim. Bell's official capacity RLUIPA claim for injunctive relief survives summary judgment.

### 3. First Amendment Access to Literature Claims

Bell alleges that defendants violated his First Amendment right to access literature when they denied him issues of Lion's Roar, a World War II magazine, and a prison litigation self-help book. Doc. 63 at 3. The same *Turner* analysis applied above to Bell's First Amendment free exercise claim is applied to these as-applied challenges. *See Kaden*, 651 F.3d at 968 (citing *Turner*, 482 U.S. at 89-90).

#### a. Issues of Lion's Roar

This Court has already analyzed defendants' rejection of the issues of Lion's Roar under *Turner* above. Because the analysis is the same here, summary judgment is denied as to whether defendants violated Bell's First Amendment rights. But because those rights were not clearly established at the time, defendants are entitled to qualified immunity on this individual capacity First Amendment access to literature claim for money damages. Bell's official capacity First Amendment access to literature claim for injunctive relief regarding the issues of Lion's Roar survives summary judgment.

#### b. World War II magazine

The first *Turner* factor is a threshold question for defendants' rejection of Bell's World War II magazine. *See Sisney*, 15 F.4th at 1190. The rejected images abstractly depict the

aftermath of the Hiroshima bombing. *See* Docs. 61-1, 61-2. Human forms, some of which are barely clothed or unclothed, are visible, and the second image submitted by Bell contains a woman's bare torso. Docs. 61-1, 61-2. These images are similar to the artwork considered by the Eight Circuit in *Sisney*. Defendants argue that "there is a rational connection between censoring pornography and promoting legitimate penological interests." Doc. 36 at 42 (quoting *Sisney*, 15 F.4th at 1192. But defendants ignore *Sisney*'s holding that there is no such connection between banning pictures of artwork and legitimate government interests. *See id.* at 1193. Thus, summary judgment is denied as to whether defendants have violated Bell's First Amendment rights.

For the reasons discussed above, defendants are protected by qualified immunity from Bell's individual capacity First Amendment access to literature claim for money damages. Bell alleges that the magazine was rejected on September 29, 2020, about a year before the Eighth Circuit decided *Sisney*. *See* Doc. 1-1 at 24. Thus, because the rule in *Sisney* was not clearly established at the time the magazine was rejected and because a very high bar must be met for a prior as-applied challenge to clearly establish a rule for later as-applied challenges, defendants are entitled to qualified immunity on this individual capacity First Amendment access to literature claim for money damages.

Defendants argue that the magazine issue in question was sent to the SDSP viewing room, where it can still be accessed by Bell. *See* Doc. 36 at 41 n.8. Defendants make no argument regarding the legitimate government interests furthered by application of this policy to this particular magazine issue and instead only argue that the magazine issue falls under the policy. *See id.* at 41-46. Thus, summary judgment on Bell's official capacity claim for injunctive relief is inappropriate at this time.

**c. Prison Litigation Self-Help Book**

Bell's prison litigation self-help book was rejected because it arrived in an envelope with an adhesive address label in violation of SDSP policy. Doc. 52 ¶ 136. Defendants argue that this district has previously upheld this policy as constitutional and that its purpose is to prevent illegal drugs from entering SDSP through stickers. Doc. 36 at 47-48 (citing *Maday v. Dooley*, 2019 WL 4935705, at *27 (D.S.D. Mar. 8, 2019)); Doc. 52 ¶ 142. Bell argues that other material he has received has had similar adhesive labels, including issues of Lion's Roar, and that this book was rejected because of its content. Doc. 63 at 3. Bell further argues that mail sent in an envelope with an adhesive label could be removed from the envelope and provided to inmates. *Id.* at 20. He notes that the SDSP policy appears to contemplate this scenario when it allows noncompliant contraband and correspondence to be "removed from received correspondence, which is opened/processed by mailroom staff *to facilitate delivery of approved items of correspondence <u>contained within the envelope</u>*." *Id.* (citation omitted). Defendants respond that this policy language only applies to otherwise-conforming envelopes that have been opened and processed by mailroom staff. Doc. 68 at 16. Once opened, if mailroom staff find both approved and unapproved items in an envelope, the unapproved items are removed and the approved items are delivered to the inmate under the policy. *Id.*

Defendants satisfy the threshold question under *Turner* because keeping drugs out of prisons is a legitimate government interest, and the policy banning adhesives is reasonably related to this interest. *See* Doc. 36 at 47 (citations omitted). Thus, this Court must assess the policy in question under the other three *Turner* factors. Defendants cite to *Maday*, in which Magistrate Judge Duffy's report and recommendation noted that another district court has upheld

a similar prison policy regarding adhesive stickers.[5] 2019 WL 4935705, at *27 (citing *Jeffries v. Snake River Corr. – Or.*, 2008 WL 3200802, at *4-5 (D. Or. Aug. 4, 2008)). In *Jeffries*, the District of Oregon found that the three remaining *Turner* factors all favored the defendants. 2008 WL 3200802, at *4. First, inmates were not deprived of their right to send and receive mail because they could receive mail free from adhesives and senders could resend mail after correcting deficiencies. *Id.* Second, allowing adhesives into the prison would adversely affect guards, inmates, and prison resources by introducing contraband. *Id.* Third, the plaintiff in *Jeffries* only suggested that mail with stickers and adhesives be delivered to inmates as an alternative, which the court correctly found to be unreasonable. *Id.*

Here, the Court agrees with *Jeffries* as to the first remaining factor. Bell can still send and receive mail that complies with prison policies. But unlike in *Jeffries*, Bell identifies a potentially viable alternative, which changes the consideration as to the second and third factors. Bell argues that mail can be removed from nonconforming envelopes and delivered to inmates without the envelopes. Doc. 63 at 20. *Turner* explained that the second factor, identified above as the impact of the regulation on prison staff, inmates, and resources, requires consideration of "the impact *accommodation of the asserted constitutional right* will have on guards and other inmates, and on the allocation of prison resources generally." 482 U.S. at 90 (emphasis added). Under this factor, "[w]hen accommodation of an asserted right will have a significant 'ripple effect' on

---

[5] The *Maday* court found that the plaintiff did not bring a constitutional claim and only alleged that defendants violated their own policies. 2019 WL 5935705, at *27. The court found that "to the extent a reviewing court believes [the plaintiff] *has* asserted a constitutional claim," the reviewing court should adopt the analysis of *Jeffries* and grant summary judgment in favor of defendants. *Id.* The reviewing court did not reach the question of a constitutional claim. *See Maday v. Dooley*, 2019 WL 4747058, at *23 (D.S.D. Sept. 30, 2019) ("The court interprets Maday's claim as defendants' failure to follow their own policy. For the reasons stated above, defendants' failure to follow their own policy is not a constitutional claim.").

fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Id.* Thus, this Court will consider the potential ripple effect of accommodating Bell's asserted right by implementing his proposed alternative while being deferential to corrections officials' discretion as to the impact of that ripple effect.

The Court finds that the alternative of removing mail from nonconforming envelopes and delivering it to inmates may have a significant ripple effect, but there is not enough evidence on the record to make that determination. In response to Bell's suggestion that books sent in nonconforming envelopes could be removed from those envelopes and provided to inmates, defendants only argue that Bell misinterpreted SDSP policy. Doc. 68 at 16. Defendants are correct as to the policy but make no argument regarding *Turner*'s applicability to this policy or Bell's suggestion. *See id.* at 15-16. Importantly, they make no claim as to the impact of Bell's proposed alternative. *See id.* Requiring SDSP staff to open envelopes with adhesive stickers may result in an unmanageable workload and burden on SDSP resources, but without further evidence as to the impact that removing mail from nonconforming envelopes would have on SDSP staff, inmates, and resources, this Court cannot evaluate the potential ripple effects of this alternative.

The final factor of *Turner* considers "the availability of ready alternatives to the regulation." *Hamilton*, 74 F.3d at 1551 (citing *Turner*, 482 U.S. at 89-91). Bell has suggested a potentially reasonable alternative, and defendants have not argued against the feasibility of this alternative other than to state that it violates SDSP policy. *See* Doc. 68 at 15-16. Thus, because this Court cannot determine the last two *Turner* factors without further evidence as to the impact of this alternative, summary judgment is denied as to whether defendants violated Bell's First Amendment right to access literature by denying him his prison litigation self-help book.

The SDSP mail policy prohibiting adhesive labels provides that "exceptions may apply to religious and education organizations or attorney/privileged sources[.]" Doc. 43 ¶ 50. Bell argues that "a reasonable person in Miller-Hunhoff's position would have 'reason to believe' that the source of the litigation handbook was educational, which is further reinforced by the name of the book itself." Doc. 58 ¶ 153. Defendants argue that Miller-Hunhoff had no reason to believe the envelope, which came from the Human Rights Defense Center, fell within this exception because the book was never removed from the envelope. Doc. 68 at 15 n.3. It is unclear from the record if the envelope or return address label indicated that the envelope came from the Human Rights Defense Center. *See* Doc. 1-1 at 16-18, 31-32. Regardless, the policy exception is permissive and "*may* apply to . . . education organizations[.]" Doc. 43 ¶ 50 (emphasis added). And even if this were not the case, Miller-Hunhoff's failure to follow SDSP policy, alone, is not a constitutional violation. *See Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003) (citing *Kennedy v. Blankenship*, 100 F.3d 640, 643 (8th Cir. 1996)). Bell has made no showing that defendants violated a clearly established right in rejecting his prison litigation self-help book under the SDSP policy banning adhesive labels. Thus, defendants are entitled to qualified immunity on this individual capacity First Amendment access to literature claim for money damages. Bell's official capacity First Amendment access to literature claim for injunctive relief regarding the prison litigation self-help book survives summary judgment.

### 4. Fourteenth Amendment Equal Protection Claims

Bell alleges that he "has been singled out and subjected to disparate treatment" because of his Buddhist beliefs in violation of his Fourteenth Amendment right to equal protection of the laws. Doc. 54-1 ¶¶ 90-97. Bell argues that the Christian Bible, which he alleges contains sexually explicit material, is allowed in SDSP, but the rejected issues of Lion's Roar are not. *See* Doc. 52

¶ 146. Bell further claims that there are other instances of equal protection violations on religious grounds, such as unequal enforcement of the adhesive label policy, but that discovery is required as to those instances of further treatment. Doc. 1 at 23; Doc. 58 ¶¶ 145-146.

The equal protection clause of the Fourteenth Amendment requires the government to "treat similarly situated people alike," a protection that applies to prisoners. *Murphy*, 372 F.3d at 984 (quoting *Rouse v. Benson*, 193 F.3d 936, 942 (8th Cir. 1999)). To show an equal protection violation, Bell must show: (1) he is treated differently than a similarly situated class of inmates; (2) the different treatment burdens a fundamental right; and (3) there is no rational relation between the different treatment and any legitimate penal interest. *Id.* (citing *Weiler v. Purkett*, 137 F.3d 1047, 1051 (8th Cir. 1998) (en banc)). In *Patel*, the Eighth Circuit explained that for a prisoner to prevail on an equal protection claim, he "must show that he is treated differently from similarly-situated inmates and that the different treatment is based upon either a suspect classification or a fundamental right." *Patel*, 515 F.3d at 815 (internal quotation and citations omitted). Religion is a suspect classification. *See Burlington N. R.R. Co. v. Ford*, 504 U.S. 648, 651 (1992) (describing "race or religion" as suspect classes).

Bell must also "show intentional or purposeful discrimination." *Phillips*, 320 F.3d at 848 (citing *Klinger v. Dep't of Corr.*, 31 F.3d 727, 733 (8th Cir. 1994)). "Discriminatory purpose can be proved with various kinds of direct and circumstantial evidence but is most often proved with evidence that similarly situated inmates were treated differently." *Lewis v. Jacks*, 486 F.3d 1025, 1028 (8th Cir. 2007). But "[a] few individual examples of unequal treatment are 'insufficient to provide more than minimal support to an inference of classwide purposeful discrimination.'" *Weiler*, 137 F.3d at 1052 (quoting *Inmates of Neb. Penal and Corr. Complex v. Greenholtz*, 567 F.2d 1368, 1381 (8th Cir. 1977).

Here, Bell does not identify which portions of the Christian Bible are explicit. *See* Doc.

52 ¶ 146. In *Sisney*, the Eighth Circuit considered whether two portions of the Christian Bible

were sexually explicit when it rejected the plaintiff's argument that a prison policy against

"graphic" depictions of sexual acts was substantially overbroad because it would have banned

these portions. 15 F.4th at 1199. The Eighth Circuit found that it would be "fairly possible, even

plausible" to interpret the word "graphic" in such a manner that it would not include the cited

Christian Bible portions. *Id.* Instead, these portions were "brief allusions to a sexual act, the first

cloaked in euphemism and the second in metaphor," that were not "vivid picture[s] with explicit

detail" or "clear lifelike or vividly realistic description[s]." *Id.* (internal quotations omitted).

Further, Bell has presented no evidence that any difference in treatment regarding the Christian

Bible and Lion's Roar was motivated by his religious beliefs.

Bell argues that discovery is needed to uncover further evidence of unequal treatment.

Doc. 58 ¶¶ 145-146. Dismissal on grounds of qualified immunity prior to discovery is proper

when "the actions [plaintiffs] *allege* [defendant] to have taken are actions that a reasonable

officer could have believed lawful." *Anderson*, 483 U.S. at 646 n.6 (emphasis added). But the

Supreme Court also cautioned in *Anderson* that "[o]ne of the purposes of the *Harlow* qualified

immunity standard is to protect public officials from the 'broad-ranging discovery' that can be

'peculiarly disruptive of effective government.' " *Id.* (quoting *Harlow*, 457 U.S. at 817). "[I]f the

plaintiffs' allegations state a claim of violation of clearly established law and the parties disagree

as to what actions the law enforcement officers took, discovery *may* be appropriate for the

limited purpose of addressing the issue of qualified immunity." *Lovelace v. Delo*, 47 F.3d 286,

287 (8th Cir. 1995) (per curiam) (emphasis added) (citing *Anderson*, 483 U.S. at 646 n.6). The

Eighth Circuit has explained that "discovery should occur on the issue of qualified immunity

only if the parties disagree as to what actions [the officials] took and if the plaintiff can present some evidence to support [his] allegations. Mere allegations, without more, do not create a question of fact as to qualified immunity." *Ginter v. Stallcup*, 869 F.2d 384, 388 (8th Cir. 1989) (per curiam).

Bell has submitted an affidavit under Federal Rule of Civil Procedure 56(d) in which he states that discovery is necessary to respond to Defendant's statement of undisputed material facts. Doc. 62 ¶¶ 1-2. Under Rule 56(d), if a party opposing summary judgment "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." The Eighth Circuit has noted that "district courts possess 'wide discretion in denying' Rule 56(d) motions." *Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 836 (8th Cir. 2015) (quoting *Toben v. Bridgestone Retail Operations, LLC*, 751 F.3d 888, 895 (8th Cir. 2014)). "[A] district court's [Rule 56(d)] discretion is further restricted when a summary judgment motion based on qualified immunity is at issue." *Id.* (alterations in original) (quoting *Jones v. City & County of Denver*, 854 F.2d 1206, 1211 (10th Cir. 1988)). A party must do more than " 'set forth some facts he hopes to elicit from further discovery.' . . . Instead, the party must 'show that the facts sought exist.' " *Id.* at 836-37 (cleaned up) (quoting *Toben*, 751 F.3d at 895).

Here, Bell has not met the heightened standard applied to Rule 56(d) when a summary judgment motion is based on qualified immunity. Other than the allegation regarding the Christian Bible and Lion's Roar discussed above, Bell puts forth no evidence or even specific allegations of disparate treatment on a religious basis as required under *Ginter* to create a question of fact. *See* 869 F.2d at 388. Bell has made no showing that the facts he seeks exist.

Thus, summary judgment is granted to defendants on Bell's individual capacity Fourteenth Amendment equal protection claim for money damages.

Because qualified immunity is not available as a defense to official capacity claims for injunctive relief, immunity from suit under qualified immunity does not apply to Bell's official capacity claim. *See Pearson*, 555 U.S. at 242-243; *see also* Doc. 52 ¶ 11 ("Defendants' Motion for Summary Judgment, with the exception of Bell's purported RLUIPA claim, will thus be confined to addressing the various allegations raised by Bell against them in their individual capacities."). Bell has not had discovery to further develop this claim, and summary judgment is denied as to Bell's official capacity Fourteenth Amendment equal protection claim for money damages.

## IV. Defendants' Motion for Protective Order

Defendants filed a motion for a protective order staying discovery pending resolution of their motion for summary judgment. Doc. 32. This Court has now ruled on defendants' motion for summary judgment, granting it in part and denying it in part. Thus, defendants' motion for a protective order, Doc. 32, is denied as moot.

## V. Plaintiff's Request to Extend Prior Order Preserving Audio Evidence

In her October 31, 2019, ruling granting in part Bell's first motion to enforce settlement, Magistrate Judge Duffy ordered that defendants "preserve any audio recordings of radio traffic concerning Mr. Bell or cell 'B-71' from the date of the settlement agreement (January 25, 2019) to the end of [the] calendar year (December 31, 2019)." *Bell v. Young*, 2019 WL 5677868, at *4 (D.S.D. Oct. 31, 2019). This evidence was to be preserved for three years from the date of the order, so the duty to preserve this evidence under Magistrate Judge Duffy's order will expire on October 31, 2022. *See id.* These audio recordings, if they exist, are potential evidence in the

present litigation and should be preserved. *See* Fed. R. Civ. P. 37(e); *see also Blazer v. Gall*, 2019 WL 3494785, at *3 (D.S.D. Aug. 1, 2019) (discussing the common-law duty to preserve evidence). This Court will extend Magistrate Judge Duffy's order to avoid unnecessary litigation as to the relevancy of these audio recordings to the present case, even though defendants are already under an existing duty to preserve the audio recordings in question and any other evidence pertaining to this litigation. Bell's request to extend prior order preserving audio evidence, Doc. 11, is granted. Defendants shall preserve the audio recordings in question, if they exist, for another three years from the date of this order or until the end of this litigation, whichever occurs later.

## VI. Motion for Order to Show Cause

This Court granted Bell's motion to proceed in forma pauperis and waived his initial partial filing fee in its initial screening order. Doc. 8. Although the screening order granted Bell in forma pauperis status and described the method by which fees are collected from an in forma pauperis prison litigant under the Prison Litigation Reform Act, the order did not direct SDSP to collect those fees in accordance with the PLRA. *See id.* at 2-3, 19-20. On May 31, 2022, this Court issued a nunc pro tunc order that directed the institution having custody of Bell to collect the $350 filing fee in accordance with the PLRA. Doc. 69. Bell was then assessed another $350 filing fee in addition to the $350 he owed for filing his complaint, which was not the intention of this Court's nunc pro tunc order, and Bell filed a motion to show cause as to why he was assessed an additional filing fee. Doc. 70. This Court then issued an order clarifying the filing fee, explaining that the May 31, 2022, nunc pro tunc order did not assess an additional filing fee and that, because Bell has fully paid his $350 filing fee, his filing fee for this case is fully paid.

Doc. 71. Thus, because this Court never assessed an additional filing fee, Bell's motion for order to show cause, Doc. 70, is denied as moot.

Accordingly, it is

ORDERED:

1. That Bell's motion for leave to amend complaint, Doc. 54, is granted.

2. That Dan Sullivan is substituted for Darin Young on all claims against Young in his official capacity.

3. That Bell's claims against Jennifer Dreiske in her official capacity are dismissed.

4. That Correctional Officer Neilson, Brandon Balsavage, Destiny Maranowski, Correctional Officer Loneman, Mike Leidholt, and Terri, Summit Manager, are dismissed from this case.

5. That Kellie Wasko is added as a defendant in her official capacity to all claims.

6. That Troy Ponto is added as a defendant to Bell's equal protection claim.

7. That defendants' motion for summary judgment, Doc. 35, is denied as to Bell's First Amendment retaliation claim.

8. That defendants' motion for summary judgment, Doc. 35, is granted as to Bell's individual capacity First Amendment free exercise claim for money damages. Bell's official capacity First Amendment free exercise claim for injunctive relief survives summary judgment.

9. That defendants' motion for summary judgment, Doc. 35, is granted as to Bell's individual capacity RLUIPA claim. Bell's official capacity RLUIPA claim for injunctive relief survives summary judgment.

10. That defendants' motion for summary judgment, Doc. 35, is granted as to Bell's individual capacity First Amendment access to literature claims for money damages. Bell's official capacity First Amendment access to literature claims for injunctive relief survives summary judgment.

11. That defendants' motion for summary judgment, Doc. 35, is granted as to Bell's individual capacity Fourteenth Amendment equal protection claim. Bell's official capacity Fourteenth Amendment equal protection claim survives summary judgment.

12. That defendants' motion for protective order, Doc. 32, is denied as moot.

13. That Bell's request to extend prior order preserving audio evidence, Doc. 11, is granted. Defendants shall preserve the audio recordings in question, if they exist, for another three years from the date of this order.

14. That Bell's motion for order to show cause. Doc. 70, is denied as moot.

DATED September 27th, 2022.

BY THE COURT:

ATTEST:
MATTHEW W. THELEN, CLERK

Lawrence L. Piersol
United States District Judge

44